L. D. KELLOGG, Josephine S. Kellogg, and L. D. Kellogg Lumber Co., Inc., Plaintiffs,

v.

GEORGIA–PACIFIC PAPER CORPORATION et al., Defendants.

No. E.D. 973.

United States District Court
W. D. Arkansas,
El Dorado Division.

March 24, 1964.

720

G. Thomas Eisele, Little Rock, Ark., C. Randolph Warner, Jr., Fort Smith, Ark., for plaintiffs.

Wayne Owen, Little Rock, Ark., for defendants.

HENLEY, District Judge.

This is an equitable action brought by minority stockholders of The Crossett Company (hereinafter Crossett), a dissolved Arkansas corporation, against that corporation, its former directors and present trustees in dissolution, fourteen in number and hereinafter called the Trustees, and against Georgia-Pacific Paper Corporation (hereinafter Georgia-Pacific), a Delaware Corporation authorized to do business and doing business in Arkansas. Federal jurisdiction based upon diversity of citizenship and the requisite amount in controversy is not questioned and is present. The cause is now before the Court on plaintiffs' motion for partial summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.

By their action, as it now stands, plaintiffs seek equitable relief with respect to the plan of liquidation and distribution of the assets of Crossett which was adopted following its dissolution on July 30, 1962, at the instance of Georgia-Pacific which had by that time acquired more than 99 per cent of the common and preferred stock of Crossett. In a nutshell the plan of liquidation and distribution contemplates that Georgia-Pacific is to take over, and indeed Georgia-Pacific has taken over, all of the assets and the business of Crossett as Georgia-Pacific's distributive share in liquidation, except that plaintiffs, as minority stockholders, are to be paid for their shares in cash at the rate of $54.85 per share, a rate fixed by Georgia-Pacific and apparently based on the book value of the Crossett stock. Plaintiffs have refused to accept the cash payments contemplated by the plan, and by their instant motion they seek a declaration that the plan is invalid as a matter of law, while leaving for future determination the question of the precise relief which should be granted to them.[1]

1. The question presented by the motion is a narrow one, and is only one of a number tendered by the pleadings. Prior to the filing of said motion, numerous other motions and cross motions were filed, rather extensive discovery by way of in-

Prior to its dissolution Crossett had its principal place of business in the City of Crossett, Ashley County, Arkansas, located in the southern portion of the State which is heavily forested with valuable pine timber. Crossett was engaged extensively in the production, conservation, and harvesting of that timber, and in the manufacture and sale of lumber and other forest products. It owned timber and timberlands, mills and factories, town lots in Crossett, and other properties of various and sundry kinds. Its net assets upon which the $54.85 per share valuation of Crossett's stock was based were in excess of $125,000,000. The overall Crossett operations were not only of significance to the stockholders, suppliers, and employees of the company, but were also of great significance to the economic welfare of South Arkansas and North Louisiana. The present Crossett operations of Georgia-Pacific are of equal if not greater overall significance.

In the spring of 1962 a large majority of Crossett stock[2] was owned by the Crossett, Gates, and Watzek families; the remainder of the stock was held by the public, including plaintiffs. During the period just mentioned Georgia-Pacific began to acquire Crossett stock at a price of $55 per share, and by July 1962 had acquired approximately 99.6 per cent of the stock, which acquisitions, of course, gave it full control over the assets and affairs of Crossett. While plaintiffs were given an opportunity to sell to Georgia-Pacific at the $55 per share price, they did not do so.

On or about July 9, 1962, after Georgia-Pacific had acquired control of Crossett, the then members of Crossett's board of directors resigned, and a new board of fourteen men, the present Trustees, was elected.[3] On July 9, 1962, the new board adopted a resolution to the effect that it was in the best interest of Crossett that it be dissolved, and it was further resolved that a special meeting of stockholders would be held on July 30, 1962, to consider the question of dissolution.[4]

Notice of the stockholders' meeting was mailed on July 14, 1962, and the notice recited that the meeting would be held at Crossett. However, it seems that the meeting was actually held in Portland, Oregon, the home office of Georgia-Pacific or its parent corporation. The record does not indicate that any stockholder other than Georgia-Pacific attended the meeting or was represented thereat. The record does establish that plaintiffs did not attend, nor were they represented.

At the July 30 meeting a resolution was adopted calling for Crossett's dissolution and for the winding up of its affairs in the manner that has been outlined. On July 31, 1962, the Crossett

terrogatories and requests for admissions was employed by plaintiffs, and a number of interlocutory opinions and orders were filed and entered so that the record before the Court is a voluminous one.

2. There were two classes of that stock: Class A which was the common voting stock, and Class B which was the preferred stock. Apparently all voting rights were vested in the Class A stock, but for purposes of liquidation no different valuation was placed upon the common stock than was placed upon the preferred stock. The plaintiffs, considered together, own both common and preferred stock.

3. It may be said at this point that Georgia-Pacific Paper Corporation is a wholly owned subsidiary of Georgia-Pacific Corporation. It is fairly inferable that the new board of directors of Crossett was made up of management personnel in the employ of either Georgia-Pacific or of that corporation's parent organization. None of the members of the new board was a citizen or resident of Arkansas.

4. Ark.Stats. § 64–805, provides that an Arkansas corporation may be dissolved voluntarily upon resolution of the board of directors followed by a meeting of the stockholders. If the holders of two thirds or more of the voting stock approve dissolution, a copy of the stockholders' resolution to dissolve is to be filed in duplicate with the Secretary of State. One of the duplicate copies, certified by the Secretary, is to be filed with the appropriate county clerk. The effective date of dissolution is the date of the filing of the resolution in the office of the Secretary of State.

directors, acting as trustees in dissolution, held another meeting in Portland and took appropriate steps to implement the plan of liquidation.

In due course the Trustees offered plaintiffs, or at least offered Mrs. Kellogg, the $54.85 per share cash payments for the outstanding stock. Plaintiffs refused to accept such payments and commenced this action.

It is the theory of the plaintiffs that Georgia-Pacific, as the majority stockholder of Crossett, owed plaintiffs, as minority stockholders, a fiduciary duty to manage the affairs and wind up the business of Crossett, including the liquidation of its assets, for the benefit and best interests of all of the stockholders, including the minority; that Georgia-Pacific and the Trustees had no right to adopt a plan of liquidation which would favor Georgia-Pacific at the expense of the plaintiffs; that plaintiffs and Georgia-Pacific were the beneficial owners of all of the assets of Crossett as tenants in common; that having dissolved the corporation Georgia-Pacific and the Trustees, after making provision for the payment of corporate debts (which appears to have been done), were required either to distribute the assets in kind among all of the stockholders in proportion to their stock ownership, or to sell all of the assets on the open market and divide the proceeds on a pro-rata basis. As indicated, plaintiffs contend that Georgia-Pacific had no right to take over the assets and affairs of Crossett as a going concern and require plaintiffs to accept a pre-determined cash payment as compensation for their stock ownership.

In resisting the claim of plaintiffs the defendants contend that plaintiffs' interest in Crossett was too small to give them standing to contest the plan of liquidation; that they were dilatory in asserting their objections; that Georgia-Pacific and the Trustees have acted in the utmost good faith and with the utmost regard for the interests of plaintiffs; that the Trustees in working out a method of liquidation were faced with a number of alternatives, and selected the one which was most feasible and which was actually in the best interests of all concerned.

From its consideration of the facts of record in the light of what appear to be governing provisions and principles of law the Court is persuaded that while some of the contentions of the defendants may have some relevancy on the question of what relief is to be granted plaintiffs, none of them can be sustained as far as the legality of the plan of liquidation is concerned, and that plaintiffs are entitled at this time to a binding adjudication that the plan adopted was illegal.

The Arkansas statutes prescribe the method by which the affairs and assets of dissolved domestic corporations are to be liquidated. Ark.Stats. §§ 64–806, 64–807, and 64–811. Without stopping to abstract those statutory provisions in detail, they contemplate that the trustees in liquidation shall collect the corporate assets, pay or provide for the payment of corporate debts and liabilities, and distribute remaining assets in cash or in kind to the former stockholders in proportion to their stock ownership. Those statutes do not contemplate that the trustees in the absence of an agreement among the stockholders shall turn the corporate business and physical assets over to one stockholder or group of stockholders while requiring some other stockholder or stockholders to accept cash as his or their distributive share in liquidation.[5]

5. The statement just made is subject to one qualification which has no bearing on this case, but which should probably be mentioned. Section 64–807 provides in part that a majority of the stockholders may authorize the sale of corporate assets to another corporation and take in payment thereof the stock of that corporation to be distributed among the stockholders of the former corporation in proportion to their original stock ownership. It is further provided, however, that if any stockholder objects within 30 days to accepting the new stock in payment for his old, he is entitled to receive the fair cash value of his old stock to be determined as provided in section 64–603, the payment to be made within 30 days after

As to the legality of the plan of liquidation, the case of Mason v. Pewabic Mining Company, 133 U.S. 50, 10 S.Ct. 224, 33 L.Ed. 524, decided in 1890, appears to be in point here. In that case the Pewabic Mining Company was in distressed financial condition; the majority stockholders of Pewabic were apparently not willing to put any more money into that corporation. Instead, they organized a new corporation which they controlled. It was decided that Pewabic would be dissolved; that Pewabic's assets would be turned over to the new corporation in satisfaction of the stock interest of the majority stockholders, and that the owners of the minority stock would be paid in cash for their stock on the basis of a valuation fixed by the majority. It was held that this method of winding up the affairs of Pewabic was illegal and was subject to injunction. The Court said (pp. 58–59 of 133 U.S., p. 228 of 10 S. Ct., 33 L.Ed. 524):

"With regard to the main question, the power of the directors and of the majority of the corporation to sell all of the assets and property of the Pewabic Mining Company to the new corporation under the existing circumstances of this case, we concur with the circuit court. It is earnestly argued that the majority of the stockholders—such a relatively large majority in interest—have a right to control in this matter, especially as the corporation exists for no other purpose but that of winding up its affairs, and that, therefore, the majority should control in determining what is for the interest of the whole, and as to the best manner of effecting this object. It is further said that in the present case the dissenting stockholders are not compelled to enter into a new corporation with a new set of corporators, but have their option, if they do not choose to do this, to re-ceive the value of their stock in money.

"It seems to us that there are two insurmountable objections to this view of the subject. The first of these is that the estimate of the value of the property which is to be transferred to the new corporation and the new set of stockholders is an arbitrary estimate made by this majority, and without any power on the part of the dissenting stockholders to take part, or to exercise any influence, in making this estimate. They are therefore reduced to the proposition that they must go into this new company, however much they may be convinced that it is not likely to be successful, or whatever other objections they may have to becoming members of that corporation, or they must receive for the property which they have in the old company a sum which is fixed by those who are buying them out. The injustice of this needs no comment. If this be established as a principle to govern the winding up of dissolving corporations, it places any unhappy minority, as regards the interest which they have in such corporation, under the absolute control of a majority, who may themselves, as in this case, constitute the new company, and become purchasers of all the assets of the old company at their own valuation.

"The other objection is that there is no superior right in two or three men in the old company, who may hold a preponderance of the stock, to acquire an absolute control of the whole of it, in the way which may be to their interest, or which they may think to be for the interest of the whole. So far as any legal right is concerned, the minority of the stockholders has as much authority to say to the majority as the majority has to say to them: 'We have form-

---

Chancery approval of the appraisal of the old stock. In the instant case the assets of Crossett were not "sold" to Georgia-Pacific, and plaintiffs do not appear to have ever been offered any Georgia-Pacific stock in lieu of their Crossett stock.

ed a new company to conduct the business of this old corporation and we have fixed the value of the shares of the old corporation. We propose to take the whole of it, and pay you for your shares at that valuation, unless you come into the new corporation, taking shares in it in payment of your shares in the old one.' When the proposition is thus presented, in the light of an offer made by a very small minority to a very large majority who object to it, the injustice of the proposition is readily seen; yet we know of no reason or authority why those holding a majority of the stock can place a value upon it at which a dissenting minority must sell or do something else which they think is against their interest, more than a minority can do.

"We do not see that the rights of the parties in regard to the assets of this corporation differ from those of a partnership on its dissolution, and on that subject Lindley on Partnership says [Book 3, c. 10, § 6, subdiv. 4], page 555 (2d Amer.Ed.):

" 'In the absence of a special agreement to the contrary, the right of each partner on a dissolution is to have the partnership property converted into money by a *sale* even although a sale may not be necessary for the payment of debts. This mode of ascertaining the value of the partnership effects is adopted by courts [of equity], unless some other course can be followed consistently with the agreement between the partners, and even where the partners have provided that their shares shall be ascertained in some other way, still if owing to any circumstance their agreement in this respect cannot be carried out, or if their agreement does not extend to the event which has in fact arisen, realization of the property by a sale is the only alternative which a court [of equity] can adopt.' "

Also it was said (p. 63 of 133 U.S., p. 226 of 10 S.Ct., 33 L.Ed. 524):

"We do not say that there may not be circumstances presented to a court of chancery, which is winding up a dissolved corporation and distributing its assets that will justify a decree ascertaining their value, or the value of certain parts of them, and making a distribution to partners or shareholders on that basis; but this is not the general rule by which the property in such cases is disposed of in the absence of an agreement."

The correctness of the Pewabic decision is manifest. To say that majority stockholders may dissolve a corporation and proceed to take over the business and principal assets for themselves while at the same time forcing the minority to take mere cash for their interests, the payments to be based on a valuation made by the majority, would be to confer upon the majority the power to confiscate the minority interest, thus depriving the minority shareholders of their interest in an existing business with its attendant possibilities of growth and appreciation in value, an interest which may be worth much more than the present cash value of the minority shares. Such should not be permitted.

■ In coming to the conclusion that the plan for the liquidation of Crossett which was adopted was illegal the Court does not mean to suggest that Georgia-Pacific or the Trustees have been guilty of any fraud or conscious oppression or conscious violation of any fiduciary duty. On the contrary, the Court assumes, and for summary judgment purposes must assume, that the defendants acted with subjective conscientiousness and fairness, and that the price offered for the minority stock was a fair price. But, those are not the questions before the Court at the moment.

■ While the interests of plaintiffs in Crossett were very small proportionately, those interests constituted property rights which plaintiffs are en-

titled to have declared and protected. When Georgia-Pacific decided to bring about the dissolution of Crossett rather than to continue its corporate existence and operations, it assumed the obligation to liquidate Crossett in accordance with law. It had a right to distribute the assets in kind or to put them on the block for sale and divide the proceeds, in either case treating all stockholders alike. It had no right to take over The Crossett Company as a going business and eliminate plaintiffs' interests in that company by cash payments.

■ To the argument that the method of liquidation selected was the only feasible one and was the alternative most beneficial to plaintiffs there is a conclusive answer. Georgia-Pacific was not required to dissolve and liquidate Crossett. Having chosen to dissolve and liquidate, it was required to do so lawfully. That a lawful liquidation might have produced less money or value to plaintiffs than the method selected is beside the point. Plaintiffs had the right to insist on a lawful liquidation, and they have done so.

■ The Court is going no further at this time than to declare and adjudicate that Georgia-Pacific's method of liquidating Crossett was not in accordance with law, and that plaintiffs are entitled to some relief. What specific relief should be awarded plaintiffs presents a serious problem which the Court is not now in a position to solve. Although plaintiffs are entitled to a protection of their rights, they have come into a court of equity, and the framing of an appropriate remedy rests to some extent in the discretion of the Court to be exercised within the framework of general principles of equity. The determination of the relief to be awarded plaintiffs may involve a balancing of the comparatively small interests of the plaintiffs, on the one hand, against the very large and significant interests involved on the other hand. Rights of innocent third parties may have intervened, which rights may have to be protected.

Without at all prejudging the matter, it may not be feasible to undo what has been done already. Or it may be that to divest Georgia-Pacific of its ownership of the Crossett properties might inflict undue hardship on Georgia-Pacific without any corresponding benefit to plaintiffs. It is possible that the plaintiffs may have to take money, and they may come out with less than Georgia-Pacific has offered. But, at the very least, they are entitled to the fair value of their stock, determined impartially, and are not required to accept a value fixed by the majority stockholders.

In their motion plaintiffs suggest that the parties be given thirty days within which to submit a proposed plan for the sale or distribution of the Crossett assets, and that in the meantime the Trustees be directed to continue the business subject to the further order of the Court. The Trustees will be authorized and directed to continue the business, or if, as appears to be the case, the Trustees have actually turned over the business to Georgia-Pacific, that corporation will be authorized and directed to continue the business subject to the Court's further lawful orders herein. However, while the Court thinks that ultimately a plan for the winding up of this controversy may be required, thirty days is too short a time for the purpose, and indeed the Court will not now undertake to fix any specific time within which such a plan should be submitted. The Court understands from counsel on both sides that in the past some settlement negotiations have been conducted. Those negotiations should be renewed in light of the Court's views herein set forth. If the negotiations are not fruitful, within about thirty days the Court will on short notice call a conference of counsel at which counsel should be prepared to discuss with the Court questions of further proceedings looking toward termination of the litigation by settlement or otherwise.